The People of the State of Illinois ex rel. Leo
Roginski, Appellant, v. William Hale Thompson
et al., Appellees.

Gen. No. 26,991.

1. LICENSES—*definition.* A license is a privilege given by some
competent authority to do some special thing which, if done with-
out that right, would be illegal.

2. LICENSES—*reasonableness of ordinance as to licensing public
vehicles and drivers.* The ordinance of the City of Chicago for the
licensing of public vehicles and the drivers of them and the rules
of the Public Vehicle License Commission created under that ordi-
nance are reasonable to the extent that they require a certain knowl-
edge and skill on the part of the driver and a certain efficiency on
the part of the machine and come within the scope of regulation.

3. MUNICIPAL CORPORATIONS—*refusal to grant driver's license to
properly qualified applicant.* The council of the City of Chicago and
the Public Vehicle License Commission created by it have no au-
thority to refuse to grant a license for the operation of a public
taxicab to one who shows the proper qualifications on the ground
that his car is so decorated as to imitate a taxicab that had pre-
viously been licensed.

Appeal from the Circuit Court of Cook county; the Hon. DONALD
L. MORRILL, Judge, presiding. Heard in the Branch Appellate Court
at the April term, 1921. Reversed and remanded with directions.
Opinion filed June 28, 1922.

CRUICE & LANGILLE, for appellant; A. S. LANGILLE,
of counsel.

SAMUEL A. ETTELSON, for appellees; CARL F. LUND
and BERTHOLD A. CRONSON, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the
court.

The relator, Leo Roginski, applied to the City of
Chicago for a license as a driver of, and to operate, a
taxicab or motor vehicle in the City of Chicago. The
City of Chicago, on the ground that the taxicab for

which he desired a license was "painted, decorated, designed and labeled to imitate a taxicab that had been previously licensed," refused the license.

Roginski, then, on February 8, 1921, filed a petition for mandamus, praying that the City of Chicago be ordered forthwith to issue to him a license. The City of Chicago filed an answer through its proper officers admitting substantially all the allegations in the petition, and setting up the following:

That Leo Roginski "was arrested by the police of the City of Chicago for a violation of the ordinance providing for the licensing of public vehicles and drivers of public vehicles in the City of Chicago, and the rules passed by said vehicle commission, pursuant to the authority vested in them under and by virtue of said ordinance, in that said petitioner, Leo Roginski, caused his said automobile or taxicab, for which he desired a license, to be painted, decorated, designated or labeled to imitate an automobile or taxicab which had previously been licensed as such automobile or taxicab by the City of Chicago, and said licensed automobile or taxicab is now operating as such vehicle under said license in said City of Chicago, and that said taxicab at the time said license was refused by said commission, the said taxicab was painted, decorated, designed and labeled to imitate a taxicab that had been previously licensed by said commission and said taxicab is now operating as such vehicle in the City of Chicago aforesaid."

To that part of the answer of the City of Chicago, which set up new matter, the relator, Roginski, demurred. The trial judge overruled the demurrer, and the relator electing to stand by his demurrer, the court ordered that the respondents go hence without day and recover their costs. From that order this appeal was taken.

The substantial question in the case is whether the Public Vehicle License Commission of the City of Chicago, which was created under the city ordinance for licensing public vehicles and the drivers of them,

has the right to refuse to issue a license to the relator on the sole ground that his taxicab, for which he desired a license and upon which his name appeared in letters two inches in length, was painted and decorated in the judgment of the commission in imitation of a taxicab which had previously been licensed and which was then in use.

The ordinance in question provides elaborately for the licensing of public vehicles and for an examination of applicants for licenses to drive public vehicles. It provides for the appointment of a Public Vehicle License Commission to which all applications for licenses shall be made, also that: "No public vehicle shall be licensed until it has been thoroughly and carefully inspected and examined and found to be in thoroughly safe condition for the transportation of passengers; clean, fit, of good appearance and well painted and varnished." It also provides that the commission "shall refuse a license to any vehicle found to be unfit or unsuited for public patronage." Also that the "Public Vehicle License Commission is hereby authorized and empowered to establish reasonable rules and regulations for the inspection of public vehicles and their appurtenances, construction and condition of fitness." Further: "If upon inspection a public vehicle is found to be of lawful construction and in proper condition in accordance with the provisions of this ordinance and the rules and regulations established hereunder, and upon payment of the license fee hereinafter set forth, the same shall be licensed by the Mayor," etc. It further provides that: "If the vehicle shall not be in good condition and appearance, clean and safe, and in case of horse-drawn vehicles, if the horse or horses are unfit for use, licenses when so suspended or revoked shall not be reissued until the vehicle and all its appurtenances shall be put in fit condition for use by the public to the satisfaction of the commission and the Mayor." The ordi-

nance also provides that where an applicant seeks a license as a driver he shall be twenty-one years of age, of sound physical ability, able to read and write the English language, be clean in dress and person, and not addicted to the use of intoxicating liquors, produce two affidavits of good character, give certain autobiographical data, be examined as to his knowledge of the ordinance in question, the traffic regulations and the geographical construction of the city, and, if required, "demonstrate his skill and ability to handle safely his vehicle by driving it through a crowded section of the city." It further provides that he shall have had at least six months' experience in driving a motor vehicle or at least two weeks' instruction in driving a public motor vehicle upon the streets of Chicago. The fee charged for a driver's license is $3 per annum.

The Public Vehicle License Commission, acting under the ordinance in question, passed certain regulations, one of which, rule 5, provides as follows: No license shall be issued under the ordinance in question if the vehicle sought to be licensed "is constructed, designed, painted or labeled as to be so similar to the automobiles  * * *  of any other person, firm or corporation engaged in the business of operating public vehicles in the City of Chicago, as to be an imitation thereof and calculated to deceive the patrons of public vehicles into believing that such automobiles  * * *  are in reality the automobiles  * * * of said other person, firm or corporation, when such other person, firm or corporation owning such imitated vehicle has previously been licensed  * * * and is operating such vehicle under said license." The rule further provides that after a public vehicle has been licensed any change in its painting, designing or labeling shall be submitted for inspection to the commission and if the latter finds it "is in violation of this rule, the license shall be suspended."

The argument on behalf of the city is that to grant such a license to relator would enable him to perpetrate a fraud; in other words, to allow him to operate, for public hire, a taxicab, "so painted, gotten up, and dressed, as to be calculated to cheat and defraud those citizens of the City of Chicago who use public taxicabs for hire" is neither justifiable nor reasonable.

On the other hand, it is contended that the City Council through the Public Vehicle License Commission under the ordinance in question is not entitled to refuse to issue a license merely on the ground of similarity in physical appearance of the relator's vehicle to that of one already licensed.

A license is a privilege given by some competent authority to do some special thing which if done without that right would be illegal. There are many kinds of licenses, one of which is the license to engage in a vocation which needs special surveillance. In *United States v. Cutting,* 70 U. S. 441, it is said that a license is the evidence of permission to exercise a trade or calling in consequence of the payment of a tax or duty imposed on persons carrying on such trades or calling. In *City of Burlington v. Bumgardner,* 42 Iowa 673, the court said: "The authority to license implies a power to prohibit, such being the meaning of the term. But it is now the generally received doctrine that in the case of useful employments, prohibition cannot be exercised under authority to license."

In *City of Chicago v. Collins,* 175 Ill. 445, where the court held the Chicago "Wheel Tax" ordinance to be illegal as it exacted a license fee from all owners of wheeled vehicles used for private purposes, the court said: "The city may also regulate certain occupations, such as hackmen, draymen, expressmen and the like, for such regulation is of a police character, having reference to the general welfare as a means of preventing improper exactions and extortions; and for the same reason a license may be exacted for ve-

hicles used in the transportation of goods and merchandise or of passengers or for other purposes of traffic; but such license is an occupation license and not one for the use of the streets. The license in the latter-named case is, designed to operate upon those who hold themselves out as common carriers, and a license may be exacted from such as a proper exercise of police power." In *Smith v. McDowell,* 148 Ill. 51, the court said: "The granting of power in this particular is to be construed in view of the purposes for which the municipality is invested with the control of its streets, alleys and public grounds. The municipality, in respect of its streets, is a trustee for the general public, and holds them for the use to which they are dedicated."

In *Zanone v. Mound City,* 103 Ill. 552, which was an application for a writ of mandamus for a license to keep a dramshop, the court said: "Equality before the law is a fundamental principle of our institutions, and no reason is perceived why applicants for license to keep a dramshop, who are suitable persons to be licensed, should not stand on an equality before the law. Captious discriminations among men of that trade are as obnoxious as would be such discriminations in regard to other trades. Were this an application, under like circumstances, for a license to peddle, or to carry on the business of a merchant, could there be any doubt about the right of the applicant? It is claimed that municipal authorities may exercise a discretion in such matters. We do not decide that they may not refuse license to persons of such habits and character as render them unfit persons to be licensed.

"In this case the authorities had not decided that the applicant was not a fit man to be licensed. On this record it stands confessed that the applicant is a suitable person to be licensed."

Under the ordinance in question a license is required in order that public motor vehicles and their

drivers may be regulated. That regulation is necessary in order to better protect and safeguard the property and lives of the people. The automobile is a modern instrumentality for rapid and convenient transportation and, though useful, nevertheless a source of great danger, and it is only reasonable, therefore, that great care should be taken on the part of a city before issuing licenses to applicants who desire to own and drive automobiles for profit. The ordinance in question and the rules of the commission, to the extent that they require a certain knowledge and skill on the part of the driver and a certain efficiency on ,the part of the machine, are reasonable. Those two subjects are proper matters to be considered and come, reasonably, within the scope of regulation. But in what way may it be said that the city is interested in determining whether or not two public automobiles look alike or may be distinguished from each other by its citizens?

Unfair competition is a matter of private right. As was said in *Holbrook v. Nesbitt*, 163 Mass. 120: "The court does not interfere to prevent the public from being misled, but 'for the purpose of protecting the owner of a trade or business from a fraudulent invasion of that business by somebody else.' (*Levy v. Walker*, 10 Ch. Div. 436, 438.)"

In *People ex rel. Hultman v. Gilchrist*, 114 N. Y. Misc. 651, the court held that an applicant for a license to use certain taxicabs for hire upon the streets of New York was entitled to a writ of mandamus where the commissioner of the department of licenses had refused a license, refusal being put on the ground that the right to use the colors brown and white had been adjudicated by the courts in favor of a certain company called The Brown and White Association. The court put its decision on the ground, first, that certain injunctions in favor of The Brown and White Association did not establish the right of that associa-

tion except "as against the particular defendants in those suits." Second, that the public welfare does not involve the matter of unfair competition, as unfair competition "is not intended to safeguard the public welfare, but only the interests of the complainants." *American Washboard Co. v. Saginaw Mfg. Co.,* 103 Fed. 281.

In the *Hultman* case the court undertook to explain *People ex rel. Duffy v. Gilchrist,* N. Y. L. J. August 16, 1919, which was affirmed without opinion by the Appellate Division in 190 N. Y. App. Div. 898. In the *Duffy* case the Appellate Division sustained the trial judge in his refusal to grant the writ. In the *Hultman* case it is said that that refusal was proper because it was based upon the showing by Duffy, in his petition, that the very relief he sought would have been futile. The court said: "What clear legal right did Duffy disclose when he practically conceded that his case differed in no respect from those in which adjudications had already been rendered against the right to use taxicabs similar to the one for which he sought a license?" According to the *Gilchrist* and *Duffy* cases, *supra,* it would seem to be the law in New York State that if the petitioner's right to drive a certain kind of public taxicab has been regularly adjudicated against him the city may refuse him a license, but, if the only allegations are those of simulation, it may not. In other words, the petitioner may not be deprived of his rights "by mere administrative fiat," that is without a judicial determination.

It is claimed that a citizen may desire to hire a public automobile owned by a particular person or corporation, and is entitled to be able to pick it out easily on the street, and in order to do so should be helped by the City Council; that is, the latter should refuse to license two automobiles, owned by different parties, to be used for public hire, if they look, in the judgment of the commission, substantially alike. The difficulty

with that argument is that if a city undertakes to go that far it begins to regulate private property rights and to take within its scope a consideration of what may constitute unfair competition, when, as is well known, neither the City Council nor its License Commission is a proper agency for the purpose of assisting private enterprises in the successful conduct of their business, or for determining matters of unfair competition between its citizens.

We are of the opinion that the City Council and, therefore, its License Commission, has no such authority, and if an applicant has passed his examination and is in every way eligible and his automobile is in every reasonable way efficient and satisfactory as a machine, and the right he seeks to exercise has not been determined, by appropriate litigation against him, a license should be granted.

We are of the opinion that the relator is entitled to a peremptory writ. The order appealed from is, therefore, reversed and the cause is remanded to the circuit court with directions to overrule the demurrer interposed to the answer filed by the respondent.

*Reversed and remanded with directions.*

THOMSON, P. J., and O'CONNOR, J., concur.